On 2-17-0636, President Marshall and the Secretary of the State of Marbury, Marshall, deceased Plaintiff Counselor Pete Provena Senior Services to whom it assists as Provena Geneva Care Defendant Dapolini, by the name on behalf of the plaintiff's counsel, Ms. Susan J. Schwartz. By the name on behalf of Defendant Dapolini, Mr. Garrett L. Lane. All right, Ms. Schwartz, you may proceed. Thank you. May it please the Court. We are here today because a patient who was being monitored for her safety, specifically to prevent a fall by use of a nursing prevention measure known as a clip-pull alarm bell. The clip-pull alarm is exactly what it says it is. It's an alarm. It's a warning device that is meant to alert nursing personnel that the patient is on the move. She's left her bed or she's left her chair. The alarm as a device only works if it is used appropriately, and Plaintiff's Rule 213F3 witness, Nurse Charlotte Sheffer, defined, and that testimony is uncontradicted, what appropriate use of an alarm like this is. It must be applied appropriately in a place from which the patient is unable to remove it. Can I just ask you a factual question? Of course. I'm not familiar with this type of a device. Where would you put it such that a patient could not, even a patient with dementia, could not remove it? The way that it was described in the testimony, and it is in part of our brief, is during the day they put it in the back where, attached to her gown, where she couldn't even reach her arm over her head. So she is physically impaired? No, she's not physically impaired, but they try to put the alarm someplace where the patient can't get at it. Oh, I got that. Okay. My question is, where do you put it such to prevent its removal? I mean, is there a protocol of a particular place, or it has to be, a gown has to be tied, you know, those hospital gowns, you wrap it around, and now you've got the bag. Right. So my question is, is there any protocol as to where or where to put it, or how to redress the patient or a certain type of gown where it can't be removed? In regular gowns or regular clothes sometimes, because, again, she's in a long-term acute. We are working towards going home at some point in time. Okay. It's in the back of the middle. Again, they try to do it so that they can't reach. And then at night, though, they did move it because it's painful sometimes for the patient sleeping. So they said that they did move it to the front. And that's why I think it's, you know, somewhat important in this case. Yes, there was testimony it was moved, but Nurse Shepard said that she also severely doubted, based on this patient's mental cognitive abilities, that she'd actually be physically capable of. Again, when you remove it, it makes some noise. You've got to put it back together, too, so that it stops ringing. So, I mean, it's because that's what it is. It's a pull clip. It's like a magnet, I think, so it detaches. So once it detaches, it's the ringing that summons the person out. In order to stop the ringing, you have to actually put it back together. So you have to assume that this patient who had the dementia, didn't follow cues, needed reminders, actually had the wherewithal to replace this clip in the position that it was. Which, again, when the patient gets up, it completely disengages. Yeah, that's what the idea is.  So the clip is like a magnet, like a name tag that we wear sometimes. So when the patient gets up, it detaches, and it's the detachment of the magnet that triggers the alarm to stop ringing and to start binging. Can it be knocked off unintentionally? If you were sitting in a chair, would it somehow fall off? Again, if the patient gets up and moves far enough away that that action causes the detachment, yes, sure, that can happen, but then when it happens, it rings. So what the purpose of the ring, the alarm is, is to send an alert. The patient is now at risk. The patient has now gotten up. They're not sitting in the chair where we left them. They're not in the bed where we left them and we checked them. So with this... The trial court early on in its ruling said, first of all, I think that the nurse, the plaintiff's expert witness, stopped short of saying that the deviation from the standard of care caused the fall and therefore caused the injury and deferred to the medical doctors to say that. I mean, do you agree with that first part of the statement, that the nurse stopped short of saying that the deviation caused the fall? I don't, Your Honor, and I have set forth in our brief, and I can go with it today, there are five questions, and it's the only area in the nurse's deposition where the words causation were used by the defendant. Again, this isn't a trial. It's not me putting out my witness. It's defendants trying to find out what our expert witness's opinions are. The specific question that she was asked was, are you able to state what the cause of the hip fracture was? She wasn't asked about the fall. And I think that this is an important distinction because you can have an automobile accident,  and that's in the Messick v. Johnson case, which is in my case. But here, there was testimony from a doctor that he, as the physician, who did an open reduction and actually looked at the hip bone, determined that this was a fracture from a fall. He knew the fall had occurred in a nursing home because that was the history that was given by the ambulance, but he didn't know what led up to that happening, and I respectfully suggest he never would. The nursing intervention that we're talking about here is specifically a nursing intervention. It's ordered by the nurse. It's put on by the nurse. It's integrity at the beginning of the shift to see that it's properly placed and it's working is checked by a nurse. The response, again, in the middle of the night in the nursing home is by a nurse. It's not by a doctor. A doctor never would be the person that would be responsible for the maintenance and the follow-through on this specific fall prevention measure. And that's why I think what was stated in the Sullivan case is important, that there are issues on which doctors are not the appropriate witness to testify, and in this case where you're talking specifically about a nursing prevention measure and how it's responded to, Charlotte Shepard, who's intimately familiar with what the procedures that are used when a device like this is used, is the witness to give that testimony. So I respectfully suggest that if you carefully look at the sequence of questions which ask her, are you giving us an opinion about the cause of the hip fracture? Do you know that there's other doctors who have testified that it wasn't from the fall? And, again, I respectfully suggest that testimony is not before this court. It's not an issue. It was never provided by the defendant. It's not part of their motion for a summary judgment. The court guessed at it, so I'm not going to dodge it, that there probably were some 213F3 witnesses that they had that said different things. But the only witness, the only doctor who testified at all about what the cause of the hip fracture was, was the doctor, the board-certified orthopedic surgeon who repaired it, looked at it, and fixed it. And he said that it was a fracture from a fall. So it's our intention that what we're examining in this case are what were these circumstances that led to a patient who's known to be with dementia, who is actually supplied a fall prevention measure for her safety, if that's what the monitor's being used for, if she's in bed and it's on and it's working and she's found in the bathroom on the floor with her pants pulled down and her diaper pulled down, how did she get to the bed from the floor without anybody coming to her? If the alarm was ringing, and again, it's a constant ring. It doesn't stop until somebody comes and attends to the patient. Then where were they and why didn't they respond timely, as Nurse Shepard said they should have done prior to the time they'd fallen? Again, this is a patient who requires assistance in all of her transfers from the bed to the chair and in toileting. So that is where we respectfully suggest that if you read closely, the only thing that Charlotte Shepard conceded, and again, it was grudgingly, is maybe, okay, a doctor, that's what I'm familiar with, falls like this happen and you get a fracture. I'll concede that a doctor may have something to say about that. I only know what the treating doctor said. He said it was from the fall. But she never conceded that the deviations from the standard of care that I identified, I can't say that those were a cracks in the cause of the fall. That was the only reason she was there. And that's why I suggest that in looking at this issue, examination of not only her deposition but the Rule 213F3 disclosure in its entirety is important because Nurse Shepard testified that that disclosure was her opinion. And in that opinion, she sets forth the facts upon which she's relying upon to reach her opinion that I have discussed with you briefly in ways that, again, this is a patient with dementia. She's determined to be at high risk for falls. She's given a fall prevention measure, this clip pull alarm that she wears whenever she's in bed or in a chair. Nurses check it at the beginning of every shift to see whether it's properly applied and whether it works. And then she sets forth what the response is that's required to the alarm. It's either, A, if you know the patient can take it off and remove it, then you either have to put it somewhere where she can't or you have to do something different, or if she's wearing it and you're using it and it detaches and it sounds, you must respond timely prior to the time the patient falls. Whether the patient takes it off or she gets up, it produces the same alarm. It's the same alarm. Once she detaches it. So then we have to say that not only did she do that, she then had the wherewithal and the smarts to put it back together, to hop out of bed, knowing that that's what she was doing in essence to divert the attention of the caregivers and to get to the bathroom. Again, Nurse Shepard said that in her opinion it was unlikely, and that's uncontradicted on the evidence before the court, that the patient could do that. But, again, she could rule it out. All the possibilities? Of course not. But, again, unlikely. But even that, if that had been done, is something that the nurses intervening and caring for this patient should have documented and done something different to demonstrate that there was some testimony from one nurse that she had removed it on prior occasions but no injury had occurred. Are they keeping a log of these things, too, that would ultimately be usable? There is not in this case a log of that type. I respectfully suggest that the court has him and the person that attended the depositions. That's not necessarily in the materials that are there, but I let you know that it is not there. It would certainly be one of the things we'd be talking about in the gestalt again as we're presenting this case. So it is our opinion, Your Honor, that there is no gap in proximate cause because our expert witness, Nurse Shepard, never withdrew her opinion or deferred on what caused the fall as opposed to the fracture, and that that is clear from the 213 disclosure when she says specifically that they failed to keep her safe. And again, the safety in this case is safe from a fall. We're not talking about malnourishment. We're not talking about being assaulted by a roommate in a room. It's specifically using this fall prevention measure, which was known as the clip-pull alarm. But then in the alternative, the trial court in his ruling stated that there was circumstantial evidence that this fall had occurred while this patient was hooked up to an alarm, and even though there was that circumstantial evidence that perhaps it wasn't responded to, that he believed that in this case, again, he found the gap. He found that Nurse Shepard had abdicated on the issue of proximate cause. So he said that you had to have expert testimony in a case like this to show the deviation caused. And again, it kept being conflated, hip fracture, injury. I again suggest that what we need to be focusing here is on the fall, caused the fall. And I specifically raised at oral argument on March 17th, the day that this motion for summary judgment was heard, brought my cases, handed them to the judge. He took a recess, and after the recess, made his ruling. The cases that were specifically brought to the judge's attention were the Williams case, the Coons case, the Prairie case, and the Schindel case, all of which I then, once he made this ruling, that he didn't believe that circumstantial evidence was enough for him to raise the issue of cause and fact, or legal fact, and that he was going to look to you, the appellate court, to provide whether that was enough in this case. It was then that I felt compelled that I must file a motion to reconsider for him to look at the law and to have the opportunity to see what the law on the common knowledge gross negligence exception was, what the law on speculation and contingency in a case like this was, what the law of circumstantial evidence was. And then, even after reviewing that, again, pointing out to him all the things I'm trying to tell you about from the testimony in Nurse Shepherd, he said that, yes, that may have augmented the argument on the common knowledge exception, but in his mind, there was still a gap. I respectfully suggest that the gap that's there, if this court perceives is there, is exactly the type of question or issue that can be solved by jurors themselves, even without the assistance of an expert to provide proximate cause. And I state this based on, defendant has raised somewhat that you can use the common knowledge or gross negligence exception to prove a breach of the standard of care and what the standard of care is but not proximate cause. And I would direct the court to the Heastie v. Roberts, the Illinois Supreme Court case, where that court, citing Prairie, which is also another case that we cited in our materials, that whether expert testimony in a given case is necessary to determine what the applicable standard of care and determining whether there was a deviation from the standard of care and whether there was an injury proximately caused by the deviation, requires consideration of knowledge or skill or training in a technical area outside the comprehension of a layperson. That expert testimony is not required if the health care provider's conduct is so grossly negligent or the treatment is so common that a layperson could appreciate it. And again, they weren't distinguishing between the various elements of a negligence case, duty, breach, and proximate cause. It was all of them. And interestingly, in the Prairie case, which the Supreme Court cited, in Prairie, it was the issue in that case that expert testimony had been provided for proximate cause but not the breach. But the Prairie case, it's also stated that the distinction was not critical, looked to and cited an older case called Newman, which we've also cited in our brief. And in that case, the expert testimony in the standard of care was provided by the defendant physician. And what it involved was a patient who was restrained and being held down during a gastroscopy procedure, and she was lifted during it, and the gastroscope punctured her esophagus. The testimony on deviation of proximate cause, as described by the Prairie court, was the patient herself stating that she felt the pain from the scope being used and going through her esophagus, and that was enough to provide the proximate cause of the injury. So I suggest that falls are the type of things that laypersons are very familiar with, and the understanding of how a fall prevention device would be utilized to prevent a fall is something that they can readily understand. At argument, you relied exclusively on the expert opinion of the nurse and the doctor, correct? At argument for summary judgment. At argument for summary judgment, I did rely on, just as I have today, what I told you about the nurse, the doctor providing proximate cause for the issue of the fracture coming from a fall. But I did also specifically raise at oral argument, and it's very clear in the transcript from March 17th, I raised the Prairie case, the Coons case, the Shindell case, and the Williams v. University of Chicago case, all to talk about this concept of the common knowledge or gross negligence consideration that jurors can find cause of fact and legal cause in a malpractice case and circumstantial evidence can be used to find proximate cause. Thank you. Counsel, can you say your last name? Fain. Fain, thank you. Thank you. May it please the Court. Counsel, my name is Garrett Fain. I'm here on behalf of Provena Senior Services. In this medical malpractice, medical perceptual negligence case, as it's pleaded, Provena asked the Court to affirm summary judgment in his favor. You get right to the point. Whether or not there was a gap in the evidence, Provena obviously suggests the answer is yes. As Counsel conceded, she relied upon the testimony of Nurse Olson. I'm sorry, not Nurse Olson. We'll get to Nurse Olson in a second, but Nurse Shepard and Dr. Murawski. Now, what did Nurse Shepard say exactly? She did not say that the deviation from the standard of care that she opined about proximately caused Ms. Marshall to fall. That is nowhere in the record. It's not in the 213 disclosures, which you can find at under specific disclosures at C326 in the record. I invite you to read that. Nowhere in that disclosure did it say that the deviation from the standard of care proximately caused her to fall. Now, Plaintiff wants to bridge that. When I talk about causing her to fall, we're talking about a fall prevention. I mean, it's a little bit different, correct? I mean, nobody caused her to fall. Nobody tripped her. There wasn't a big box that somebody left in the way between her bed and the bathroom. Nobody caused her to fall. Prevention, I'm not certain that it's a good substitute for proximate cause here, but it's the same idea. What happened? What for? We always talk about, many times talk about proximate cause and say what for situation. What for the deviation from the standard of care? The deviation from the standard of care that you see would not have fallen. I mean, that's the way, you know. All right. I think the question that the court confronts is that reasonably, is there a reasonable certainty that if the penal arm had operated, that she wouldn't have fallen? Or is it a matter of speculation? And Karina suggests that it is a matter of speculation, precisely because there is evidence missing from the record. It's not whether the mechanism functioned. As I recall the facts, it had been checked. It was operating properly. The question is whether or not someone responded to that alarm in a timely fashion. It's interesting, Your Honor. There was a reference by my counterpart that the alarm was ringing at the time, and I've read this record multiple times, but I don't believe there's anywhere in this record that says at the time of her fall, the alarm was ringing. The alarm was found next to her bed. It was not on her. But I don't think there's anywhere in the record where it says it was actually ringing. What happened was Nurse Olson heard something in the room, went to go see what that noise was, and found her on the floor of her bathroom. I thought CNA Francisco found her. Who found her on the floor? I'm sorry. I thought it was Nurse Olson here when you look at her testimony. Nurse Francis, you're correct. Nurse Francis heard the sound and went to Marshall's room and found Marshall on the ground. You're correct. Thank you. So questions, pieces of fact that are missing from the record is if the alarm had operated, if it had been attached to her correctly, she had moved and had gone off, what was the timing, the response time for a nurse to come? At the time that she fell, we don't know where the nurses were. There were nurses on the floor, at least three. One was on break. We don't know where they were with us on the record. We don't know how long it would have taken a nurse to get there. We don't know how long it would have taken Ms. Marshall to get from her bed to the bathroom. Well, I think based upon the information we have, we're pretty sure she wasn't running. We're pretty sure she wasn't running, but we don't know what the time was to get from her. So wait a minute. Isn't that basically a deviation from the standard of care? If you're going to tell me that there may be some evidence out there that you put this clip on the woman and if she gets up, there may not be enough time to get there to get to her? I'm saying there's nothing in the record showing what the time would be. You sound to me like you're arguing before the jury. We're at summary judgment. The issue is whether or not there was enough evidence to get before a jury on the issue of proximate cause. The trial judge said there was a gap. Is the gap because of all these factual issues or is the gap because of the opinion? And the trial judge seemed to indicate that the nurse had an opinion as to deviation of standard of care, but then somehow because the nurse didn't have an opinion on the nature of what caused the injury or the hip fracture, that that was the gap. At least that's the way I kind of read this. Correct. I think you're accurate, Justice Burke. I think there was that gap. The trial judge said there had to be expert testimony as to proximate cause, that the deviation of the standard of care caused her to fall and then be injured. And bad testimony was missing. Plaintiff has suggested that nurse Shepard provided that. She did not. Dr. Murawski did not. Dr. Murawski specifically said he didn't have testimony on what caused her to fall. His testimony was that it looked like the injury was caused from a fall, but as to what caused her to fall, he didn't know. He didn't know anything about it. Do you agree that you could put two things together? Here we have two different causation. We have the cause of the fall and then we have the cause of the injury. Right. We're talking about the cause of the fall. So you agree that you could – both of them are relevant to this case. You have to prove that the fall caused the injury. If the injury was – she had the hip fracture before she got out of bed, then there's no liability. Correct. You have to prove – the plaintiff would have to prove both. Correct. You could put two opinions together and prove those two things, could you not? You could if they would link, but it's Pravina's position that they don't link, that there is that gap that wasn't filled, and it wasn't filled by expert testimony. And even if it could be filled by circumstantial evidence, there is the speculation and not the reasonable certainty that is required. But again, that sounds like you're arguing to a jury to make that decision. Well, I would suggest that it is the plaintiff's burden to come forward with the necessary evidence, and that hasn't been done here. And if we look at cases like Taylor or Kolomowski, those are fall cases where a patient has fallen out of the bed, and the appellate court has said those are not gross negligence cases. Those cases require expert testimony. She hasn't fallen out of the bed. She has fallen away from her bed, and she would have had to somehow mobilize herself to that location. And having done that, that alarm should have triggered either when she got out of bed or when she took it off. And we don't have, and that's what is the issue here. Did, at least the legal issue, the standard of care, did they respond in a timely manner to that particular alarm? I don't think the legal issue is standard of care. I think on appeal the issue is whether or not there is a proximate cause testimony that's necessary. And I realize that the facts are slightly different from Taylor and Kolomowski, in that she didn't fall directly out of bed, but she had taken a few steps down to the bathroom and fallen. But those cases do involve what type of restraint was in play, what the supervision was, and what kind of management of the patient was going on. And those two cases did say there's got to be proximate cause evidence provided by an expert. I would suggest to this court as well that this case is much like the Stogsdill case, where there was that missing proximate cause testimony. And because it was absent from the record, it wasn't provided, the judgment was granted in favor of the defendant against Stogsdill. It's a 1976 case, but I think it's very similar to this one. There's been a lot of talk in the briefs about common knowledge exception, recipes of low-order cases, circumstantial evidence. And going back and looking at those cases again, whether it's Prairie or it's Ellen or it's Heastie or Decker, those cases were all discussing the necessary proof of standard of care and non-proximate cause. So I don't think those cases are particularly helpful. And then I would come back to the Stogsdill case and say that is the case that actually speaks to what happened here in the lack of proximate cause evidence. This patient was tagged for being a high-risk to fall. Yes, she was. She was wearing an alarm. The alarm was functioning at the beginning of the shift. And your position is it never went off. And there is no law to say it did or it didn't. But we have a high-risk patient who got out of her bed, walked up to the bathroom, and nothing alerted the nurses that she had gotten up? All I'm finding in the record, and that's all I'm going off of here, Your Honor, is there's nothing mentioning the alarm was going off at the time that she was found. Isn't that somewhat of Provena's obligation is to make sure there is some mechanism in place to alert someone if she gets up, either from a chair or from her bed? Well, that's what I was going back to originally, the facts that are missing, and that is if the alarm had gone off, would the nurse have gotten there in time such that she did? She was right next to the nurse's station. Wouldn't she have been put there for a reason? She was close to the nurse's station, but, again, the facts don't provide where the nurses were at the time. Maybe they were in another room. I don't know. It's not in the record. We don't know how long it would have taken in that instance when that alarm had gone off. Okay, so you have these high-risk patients and not enough staff to respond when they get up? Is that what you're trying to tell me? No, that's not what I'm trying to tell you. I'm just telling you that there isn't what I see to be the necessary fact showing that the nurse would have gotten there in time to help her and that she wouldn't have fallen. And that was the facts and the proximate cause testimony that's necessary. Well, then why would they give her any sort of a device to aid them in doing that? Just happenstance? The device was designed to help them get to her. Yes, it was, certainly. And so if time is an issue, why don't you know why, and her location is an issue, why did they give her that device if they can never get to her in time? I'm not saying that they couldn't get there in time. I'm just saying that those facts, the plaintiff had them meet to come forward with the necessary evidence to avoid summary judgment. Those facts are missing. They're not there. They're not in the record, and they don't support any. There's not an expert opinion there. There's not a lay opinion there. The plaintiff's trying to bridge the gap by saying there's circumstantial evidence. But my retort is, no, we're really talking about bridging the gap through speculation rather than a reasonable certainty. If there's nothing further, I thank you. I appreciate it, and I ask the Court to affirm summary judgment. Thank you. Mr. Schwartz. Counsel, perhaps you could respond to Counsel's argument that we're bridging the gap here with speculation, that there's no evidence in the record to support the things that he was mentioning. Well, again, with that, I do respectfully disagree with Counsel that there is a record. There is the record of Nurse Shepard specifically stating that she was giving an opinion as outlined, and she agreed with the facts as outlined in her Rule 213F3 disclosure. And the disclosure isn't just a paragraph and a few sentences where we talk about the specific safety concerns of not responding to the alarm. It sets forth how she got admitted to this nursing home, that she was evaluated, that she was found to be at high risk for falls, that she was known to have dementia, that this alarm was placed by the nursing staff, that it would be checked at the beginning of the shift. That's where I'm getting the facts and the record that are there. So assuming all of those things to be true, and again, that is the documentation before this Court about her opinion. Her opinion is not just the questions defendants wanted to ask of her at the time that her discovery deposition was taken, because at trial she will testify to the things that are included within her disclosure. And we also included at the motion for reconsideration the testimony from Janet Olson, the nurse, and that's also part of the record. But I respectfully suggest that it is the circumstances that are important in this case, and that was what Nurse Shepard was testifying to when she said at her deposition, it's not the alarm that prevents the fall, it's the response to the alarm. It's staff getting to the side of the patient before she falls. And again, why does she need that? This is a patient who is known to need assistance in transfers from her bed to the chair, from her bed to the bathroom. She needs assistance in toileting, and that's also in the Rule 213 disclosure, that someone stays with her and stands by her and is with her at her side when she's in the bathroom. Why? To prevent the injury that we're talking about here. So it's preventing her fall, not causing her fall. Correct. That's what we're getting tied up with semantics here. Well, the nursing intervention that's put in place here is a fall prevention measure. Failure to respond didn't cause her to fall. Maybe she would have made it on her own, but the nurse was not there to prevent her from falling. That is correct. Or the responding party. That is correct. You are understanding what the purpose and the function of this alarm is. And that's why when we talk about reasonable certainty in terms of circumstantial evidence, as it was outlined in the Coons case, it doesn't need to be shown by direct evidence. It may be established by inference from the circumstantial evidence. It doesn't have to exclude all other possible inferences or support only one legal conclusion. It can be established where the facts and the circumstances in the light of ordinary experience, again, going back to the common understanding of laypeople, reasonably suggest that defendant's negligence produced the injury. And it's there, Your Honor, that I think is the crux of this case. I mean, in the Coons case, they were talking about circumstantial evidence from which jurors could find with reasonable certainty that a nurse having misinformed a doctor about the medications the patient was receiving and the patient then getting a medication he wasn't supposed to receive on discharge, that they could circumstantially put that together. I am suggesting that patients who have alarms in their home, that deal with alarms every day, that know what happens with the fall, understand what we're talking about here, that there's a purpose of the alert that an alarm provides. In the Edeland case, which was also another case that talked about a patient's fall in a hospital, and it dealt with an escort policy, the simple thing that we all know, that patients are escorted from their room to the car to get into that discharge. The court said that even if you looked at that as a malpractice case and not just as the policy setting the thing, that this is not the type of case, a patient's fall, is not the type of thing that automatically requires expert testimony because it's not a technical area outside the comprehension of a layperson. And the plaintiff herself in that case, because I felt weak, I fell because I wasn't escorted. I mean, that provided the proximate cause nexus. So it is on this basis that I am directing you and asking you to look carefully at our Rule 213 disclosure, which is many places at page 327 and 328 is filed in the record. At page 550 and 551 is I attached it to our response to the motion for summary judgment. And again, at the time that we brought our motion to reconsider, that if you look at the totality of the circumstances here, there's one of two things happened. If this alarm was in place and working and functioning, either Marjorie, who Nurse Shepard did not really have the wherewithal, removed it, or she got up and made a response. Counsel is emphasizing the time to get to the location, get to her. If they couldn't get to a patient, why would they give them the alarm? I mean, it doesn't seem to make any sense. It doesn't, and that's why they also put them close to the nursing station so that there's a better opportunity for people to be there. It's why they check them, even though they've already asked them whether they want them to be toileted. And it's why the bathroom, again, isn't five feet from her, but it's 15 feet. So there's a period of time that takes for the patient to actually get to the floor, walk to that door. And that's the timeframe in which we're saying there was an opportunity to intervene with this patient in the middle of the night who's waking up and has dementia. Thank you. Thank you. And thank you, Counsel, for waiting today. We do, again, apologize for the delay. It looks like the weather's turned bad, but I'm too behind myself. Thank you very much for your arguments. We'll take the matter under advisement. We will now stand adjourned for the day.